UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA FIALLOS, as parent and natural guardian of L.V., and ALEXANDRA FIALLOS, individually,

Plaintiffs,

-v-

KAMAR H. SAMUELS et al.,

Defendants.

25-CV-7281 (JMF)

AMENDED
OPINION AND ORDER[*]

JESSE M. FURMAN, United States District Judge:

This case, brought on behalf of Alexandra Fiallos, is one of hundreds filed by the Liberty and Freedom Legal Group ("LFLG") in recent years against the New York City Department of Education and its Chancellor (together, the "DOE"), seeking to secure funding under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, for a disabled child attending a school called the International Institute for the Brain ("iBrain").[1] The amount that Fiallos was seeking for a single year at iBrain is noteworthy: $937,301.25. Even more noteworthy are the close relationships between and among the entities involved in billing, and seeking to collect, that amount. For starters, LFLG and iBrain share a founder, Patrick Donohue.

[*] This Amended Opinion and Order is filed for the reasons set forth in a separate Memorandum Opinion and Order, dated today, granting in part and denying in part a motion for reconsideration filed by Liberty and Freedom Legal Group ("LFLG"). The only substantive change is that the monetary sanctions jointly and severally imposed on LFLG, Lancia, and Bellantoni are limited to only those of the DOE's fees and costs associated with litigating its repeated requests for emergency injunctive relief and the sanctions motion..

[1] Kamar H. Samuels is now the DOE Chancellor. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is automatically substituted for Defendant Melissa Aviles-Ramos.

Additionally, the company that iBrain students use for transportation was founded by Donohue's wife, and the company that iBrain students use for nursing appears to be connected too.

For present purposes, most noteworthy of all may be LFLG's litigation strategy. In this case, as in others, it filed a slew of "emergency" motions for injunctive relief against the DOE. *See* ECF Nos. 5, 22, 40. The goal of those motions was to expedite certain interim payments to Fiallos (and, by extension, to LFLG, iBrain, and its related entities) — payments that, due to a peculiar feature of the IDEA, Fiallos would be entitled to keep even if (as turned out to be the case) it were later determined that she was entitled to no funding at all under the IDEA. In this case, as in others, LFLG persisted in that litigation strategy even after it was definitively rejected by the United States Court of Appeals for the Second Circuit.

In light of that binding ruling from the Second Circuit, this Court rebuffed LFLG's efforts to expedite the DOE's payments as a baseless attempt to jump the queue. *See* ECF Nos. 44, 48, 49. After the Court ordered discovery into the finances of iBrain, LFLG then voluntarily dismissed the case. *See* ECF No. 55. The question now presented is whether LFLG and attorneys at LFLG — namely, Donohue, Rory Bellantoni, and Nicole Lancia — should be sanctioned for their conduct prior to dismissal. The DOE argues that sanctions are appropriate under either or both Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 because LFLG's motions were frivolous and there was no factual basis to characterize them as "emergencies." *See* ECF No. 70; *see also* ECF No. 71 ("Defs.' Mem."), at 26-28.

For the reasons that follow, the Court agrees with some, but not all, of the DOE's arguments and concludes that sanctions should be imposed on LFLG, Bellantoni, and Lancia under both Rule 11 and Section 1927. More specifically, the Court concludes that LFLG filed frivolous motions for the improper purpose of harassing the DOE into accelerating payments and

that it had no evidentiary basis to characterize its motions as "emergencies." Pursuant to Section 1927, the Court orders LFLG, Bellantoni, and Lancia to reimburse the DOE for the attorney's fees and costs it incurred in defending this case and litigating the present motion. Additionally, in an effort to deter LFLG from persisting in its pattern of litigation misconduct, the Court concludes non-monetary sanctions under Rule 11 are warranted and orders LFLG (1) to file a copy of this Opinion and Order in every pending IDEA case in which it is currently involved (except for any case pending before the undersigned), in any court in the country, and (2) for a period of three years, to file a copy of this Opinion and Order and an attorney declaration in connection with any motion for emergency injunctive relief that pertains to pendency placements under the IDEA.

## BACKGROUND

The Court begins by providing background on the IDEA and on iBrain, LFLG, and its litigation practices before the federal courts. The Court then turns to the events in the present case that led to the DOE's present motion for sanctions.

### A. Statutory Background

"The IDEA offers federal funds to states that demonstrate, *inter alia*, that they have developed plans to assure 'all children with disabilities residing in the state' a 'free appropriate public education' ('FAPE')." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 159-60 (2d Cir. 2004) (quoting 20 U.S.C. § 1412(a)(1)(A)). *See generally N.K. v. New York City Dep't of Educ.*, 961 F. Supp. 2d 577, 580-81 (S.D.N.Y. 2013). "The centerpiece of the IDEA's education delivery system is the individualized education program, or IEP." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (internal quotation marks omitted). A parent who is dissatisfied with a child's IEP or the State's

provision of a FAPE may file a "Due Process Complaint" or "DPC" seeking administrative and judicial review pursuant to IDEA-mandated procedures. *See Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005). During the pendency of such administrative and judicial proceedings, the IDEA requires the State to "maintain the educational status quo while the parties' dispute is being resolved." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (internal quotation marks omitted).

In particular, the IDEA's "stay-put" provision provides in relevant part that "during the pendency of any [administrative and judicial] proceedings conducted pursuant to this section, unless the [school district] . . . and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518. The statute therefore "require[s] a school district to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 531 (2d Cir. 2020) (cleaned up). And significantly, it does *not* permit a school district to recoup any such payments — even if the school district later prevails on the underlying claims. *See id.* at 531 & n.49 (citing cases). As the Second Circuit has explained: "Congress's policy choice was that a child is entitled to remain in his or her placement at public expense during the pendency of an IEP dispute, regardless of the merit of the child's IEP challenge or the outcome of the relevant proceedings." *Id.* at 531.

**B. iBrain and LFLG**

iBrain is a private school for children with traumatic brain injuries and other brain-based disorders that was founded by Donohue, an attorney. *See* Defs.' Mem. 3. Notably, Donohue is *also* the founder of LFLG, the law firm that represents Fiallos in this case and dozens of iBrain

parents and students in similar actions. *See Fiallos v. Aviles-Ramos*, No. 25-CV-7281 (JMF), 2025 WL 2961624, at *5 (S.D.N.Y. Oct. 20, 2025) (citing cases); *see also* ECF No. 78 ("Pl.'s Opp'n"), 1 n.1. iBrain and LFLG work hand-in-glove to facilitate these parents' unilateral enrollment of their disabled children at iBrain and to secure public funding for their education. More specifically, iBrain requires the parents of disabled children, upon enrollment, to sign contracts ostensibly promising to pay vast sums of money per year to iBrain and related providers for tuition and related services, including transportation and nursing services.

Fiallos, for example, signed contracts promising to pay a total of $937,301.25 for the 2025-26 school year, composed of: (1) $378,092.25 to iBrain in tuition and supplementary fees, ECF No. 9-1 ("Contracts"), at 44-50; (2) $203,546 to a company called Sisters Travel and Transportation Services, LLC ("Sisters Travel") for transportation services, Contracts 51-58; and (3) $355,663 to B&H Health Care Services ("B&H Healthcare") for nursing services, ECF No. 9-2 ("B&H Contract"), at 1-7. The fact that iBrain uses Sisters Travel and B&H Healthcare to provide transportation and nursing services to its students, however, does not appear to be a coincidence. Sisters Travel was founded by Donohue's wife, Gina Lynch-Khera, and, at least in some instances, appears to subcontract transportation services to other companies. *See Founder's Story,* IBRAIN, https://perma.cc/3N6U-AGAQ (last visited July 7, 2026). And despite being drafted for different services from ostensibly independent companies, the contracts for Sisters Travel and B&H Healthcare share the same nineteen section headings and contain substantially identical language, strongly suggesting that they were drafted by the same person or entity. *Compare* Contracts 51-58, *with* B&H Contract 1-7. Overall, for the fifty to sixty students

enrolled at iBrain, the DOE provides tens of millions of dollars every year to the school, Sisters Travel, and B&H Healthcare. *See* ECF No. 72 ("Pantalony Decl."), ¶ 17.[2]

Given the sums at stake, one might think that the parents of iBrain students are taking on an enormous financial commitment (or, at a minimum, enormous financial risk), but a closer examination of the terms of the contracts reveals that their exposure is nonexistent because the point is to secure reimbursement through litigation with the DOE. More specifically, during the relevant time, the contract with iBrain imposed no immediate payment obligations on the parents other than a $100 deposit and suspended all costs to parents while the child's lawsuit was pending before the state administrative agency. *See* Contracts 46.[3] And it provided that, if the

---

[2] To put it mildly, the sums involved and the relationships between and among iBrain, LFLG, Sisters Travel, and B&H Healthcare raise concerns about whether taxpayer dollars are being used appropriately. That concern has been raised by tribunals or parties in prior cases. *See, e.g.*, *Davis v. Banks*, 22-CV-8184 (JMF), 2023 WL 5917659, at *5 n.7 (S.D.N.Y. Sept. 11, 2023) (noting that the relationship between Lynch-Khera and Donohue might "hint[] at the possibility of . . . waste, fraud and abuse" in the contracts signed with Sisters Travel); *Mendez v. Aviles-Ramos*, No. 25-CV-5746 (CM), 2025 WL 3033725, at *3 (S.D.N.Y. Oct. 30, 2025) (suggesting that LFLG's decision to withdraw motions for injunctive relief may indicate that iBrain "has other reasons for not wanting a court to explore its finances."); *see also, e.g.*, *Ferreira v. New York City Dep't of Educ.*, No. 19-CV-2937 (JMF), No. 19-CV-8519 (JMF), 2020 WL 1158532, at *2 n.1 (S.D.N.Y. Mar. 6, 2020) (noting that a whistleblower had filed a complaint alleging that Donohue was running LFLG "as part of a scheme to funnel federal and state education funds to [himself] personally" (citing *Batmanghelidj v. Int'l Acad. of Hope*, No. 18-CV-6562 (VM) (S.D.N.Y. July 20, 2018), ECF No. 1, ¶¶ 1-4)); ECF No. 73-1 (complaint filed in state court by a Sisters Travel subcontractor alleging that Sisters Travel failed to pay it over $200,000 for transportation services rendered and that Donohue and Lynch-Khera "have diverted public funds . . . to iBrain, Sisters and to themselves"); *In re Student with a Disability*, No. 25-227, OFFICE OF STATE REV., https://perma.cc/J4TT-Z7AQ (Nov. 28, 2025) (noting that LFLG submitted misleading, if not downright false, affidavits from iBrain's deputy director attesting to a student's attendance "every day" at iBrain when, in reality, the student had been hospitalized and unable to attend school for several months). In a prior case involving iBrain and LFLG (then known as the Brain Injury Rights Group), the Second Circuit characterized the background, including the relationship between the iBrain and the law firm, as "interesting" and "curious." *de Paulino*, 959 F.2d at 528-29 & n.29.

[3] The contract refers to the $100 deposit as non-refundable, but there is reason to believe that parents are not even on the hook for that much. As of July 2026, iBrain's website provided that "[t]he only out-of-pocket expense to attend iBRAIN is a *refundable* $100 deposit (all other

state denied funding and all appeals were exhausted, the parent would "be permitted to immediately withdraw [their] Student from iBrain." *Id.* The relevant contracts with Sisters Travel and B&H Healthcare provided similar assurances. *See* Contracts 52 ("[Sisters Travel] agrees to suspend payment obligations until an interim or final administrative or judicial decision is made obligating [DOE] to pay . . . [fees]."); B&H Healthcare 3 (same).[4]

**C. LFLG's Litigation Tactics**

Armed with these contracts, LFLG typically files a DPC on behalf of the parent of each iBrain student. In most cases, as in Fiallos's, the Impartial Hearing Officer ("IHO") assigned to the case then issues a "pendency order," a form of interim relief implementing IDEA's "stay-put" provision, which obligates the DOE to fund the child's placement at iBrain while the litigation proceeds. But not content to wait, LFLG frequently runs to federal court — as it did in this case — and files "emergency" motions seeking immediate payment. (In fact, in some cases, LFLG has run to federal court even before obtaining a pendency order from the IHO. *See Ramos v. Samuels*, Nos. 25-1321, 25-1355, 2026 WL 1346852, at *1 n.4 (2d Cir. May 14, 2026) (summary order)). This strategy is almost certainly driven by the fact, noted above, that payments made pursuant to the IDEA's stay-put provision cannot be recouped — even where it is later determined that the school district is not obligated to pay anything under the IDEA. That

---

costs suspended while securing funding from the Department of Education)." *See Founder's Story,* IBRAIN, https://perma.cc/3N6U-AGAQ (last visited July 7, 2026) (emphasis added).

4 These provisions previously led the Court to question whether the parents who are bringing suit in these cases even have Article III standing to seek relief in federal court. *See Fiallos v. Aviles-Ramos*, 25-CV-7281 (JMF), 2025 WL 2961624, at *4 (S.D.N.Y. Oct. 20, 2025). The Court need not and does not weigh in on that issue here.

is, if LFLG succeeds in getting the DOE to pay up front, iBrain, Sisters Travel, and B&H Healthcare (not to mention, LFLG itself) win — *even if they end up later losing*.

The scale of LFLG's flood-the-zone approach to federal litigation is striking. Annually, the DPCs that LFLG files on behalf of the approximately fifty to sixty students at iBrain amount to less than 0.5% of all DPCs filed in New York City. *See* Pantalony Decl. ¶¶ 5-8. And yet, approximately *50%* of the federal complaints raising claims under the IDEA against the DOE are filed by LFLG. *See id.* ¶ 8.[5] LFLG's use — and abuse — of the federal courts' emergency procedures is arguably even more striking. Between 2019 and November 14, 2025, LFLG filed over 130 motions for injunctive relief in this District and the Eastern District of New York; in many of these cases, as here, LFLG filed multiple, successive emergency motions. *See* ECF No. 57-2 (listing those motions); Pantalony Decl. ¶ 11.[6] In fact, between June 2023 and November 2025, LFLG's cases accounted for over *80% of all* "emergency" motions filed against the DOE. *Id.* The scale of LFLG's efforts on this front is matched only by its lack of success. Out of the seventy-seven emergency motions LFLG filed between June 2023 and November 2025, fifty-one were denied because LFLG had failed to demonstrate a risk of irreparable harm to the student absent injunctive relief; LFLG withdrew another fourteen shortly after being filed. *See* Pantalony Decl. ¶ 11; *see also Mendez v. Aviles-Ramos*, No. 25-CV-5746 (CM), 2025 WL

---

5 LFLG's filings would likely account for an even greater share of the total federal IDEA docket if not for its practice of improperly joining plaintiffs whose claims are almost entirely unrelated but for their children's enrollment in iBrain. *See, e.g.*, *Frias v. Aviles-Ramos*, 25-CV-5936 (JPC), 2025 WL 2494336, at *3-4 (S.D.N.Y. Aug. 29, 2025).

6 November 14, 2025, is the date on which the DOE submitted the declaration that is the source of these unrebutted statistics. *See* ECF No. 72 ("Pantalony Decl."),

3033725, at *1 (S.D.N.Y. Oct. 30, 2025) (collecting cases denying LFLG's repeated requests for emergency relief).[7]

Most relevant for present purposes, LFLG's flood of emergency motions is all the more striking because it continued even *after* the firm litigated and lost a Second Circuit case, *Mendez v. Banks*, 65 F.4th 56 (2d Cir. 2023), concerning substantially identical requests for emergency injunctive relief. In that case, LFLG obtained pendency orders entitling several iBrain students to funding for tuition and related services during the pendency of the administrative proceedings. *See id.* at 60. While those proceedings were ongoing, LFLG moved for preliminary injunctions that would require the DOE to "immediately . . . fund[] the Students' tuitions and related services" pursuant to the pendency orders. *Id.* The Second Circuit rejected LFLG's attempt to jump the queue, holding that "the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement" or otherwise require the DOE to "circumvent its ordinary payment procedures." *Id.* at 63. The court of appeals held open the possibility that "[p]arents . . . may still be able to obtain such relief if they establish that a delay or failure to pay has jeopardized their child's educational placement," *id.*, but it concluded that was not the case for

---

[7] The list of cases in which LFLG's "emergency" motions were denied includes the following: *Nicholls v. Aviles-Ramos*, No. 25-CV-7569 (S.D.N.Y. Oct. 27, 2025), ECF No. 25; *Frias v. Aviles-Ramos*, No. 25-CV-5936, 2025 WL 2494336, at *4 (S.D.N.Y. Aug. 29, 2025); *Bruckauf v. Aviles-Ramos*, No. 25- CV-5679 (S.D.N.Y. Aug. 25, 2025), ECF No. 16; *Mondano v. Banks*, No. 24-CV-8241, 2025 WL 1984427, at *2 (S.D.N.Y. July 17, 2025); *Ramos v. Banks*, Nos. 24-CV-5109, 24-CV-5136, 2025 WL 1455703, at *7-8 (S.D.N.Y. May 21, 2025); *Ogunleye v. Banks*, No. 23-CV-9092, 2025 WL 1078301, at *2 (S.D.N.Y. Mar. 27, 2025); *Moonsammy v. Aviles-Ramos*, 25-CV-5923, 2025 WL 2452350. at *1 (S.D.N.Y. Aug. 26, 2025); *Bruckauf v. Banks*, No. 24-CV-5136 (S.D.N.Y. Aug. 1, 2024), ECF No. 25; *Ramos v. Banks*, No. 24-CV-5109 (S.D.N.Y. Aug. 1, 2024), ECF No. 33; *Phillips v. Banks*, No. 23-CV-2140, Minute Entry from April 20, 2023 (S.D.N.Y. Apr. 20, 2023); *Crosley v. Banks.* No. 22-CV-7101 (S.D.N.Y. Nov. 29, 2022), ECF No. 28; *Mendez v. Banks*, No. 22-CV-8397, 2022 WL 6807537, at *1-2 (S.D.N.Y. Oct. 11, 2022), *aff'd*, 65 F.4th 56 (2d Cir. 2023); *Hidalgo v. Porter*, No. 21-CV-10794 (S.D.N.Y. Apr. 29, 2022), ECF No. 33; *Abrams v. Carranza*, No. 20-CV-5085, 2020 WL 4504685, at *1 (S.D.N.Y. Aug. 5, 2020).

the *Mendez* plaintiffs because "both sides agreed that there was no risk of the students losing their pendency placements." *Id.* (cleaned up). The court noted that its conclusion "comport[ed] with the practical realities of bureaucratic administration": "If each pendency order entitled parents . . . to immediate payment, school districts would be unable to implement basic budgetary oversight measures, such as requiring receipts before reimbursement." *Id.*

**D. Factual Background**

Fiallos is the parent and natural guardian of L.V., a nineteen-year-old disabled student. ECF No. 20 ("Compl."), ¶¶ 65-66. On July 7, 2025, Fiallos requested an administrative hearing with an IHO, claiming that L.V. was entitled to $937,301.25 in funding for the 2025-2026 school year and that iBrain was an appropriate unilateral placement for L.V. *Id.* ¶ 92. On September 15, 2025, the IHO held a hearing on Fiallos's claim and entered a pendency order, mandating that the DOE pay for L.V.'s tuition at iBrain, as well as transportation costs and nursing services, for the 2025-2026 school year while her DPC was being adjudicated. *See* ECF No. 24-4, at 2. On October 15, 2025, however, the IHO issued an order holding that the DOE had provided L.V. with a FAPE and that, accordingly, Fiallos was not entitled to any reimbursement — let alone the $937,000 she had requested — for her unilateral decision to place L.V. at iBrain. *See* ECF No. 50-1, at 8-11. In his decision, the IHO noted that the "record [was] devoid of any information as to the curriculum, schedule or attendance records of [L.V.] at [iBrain]," *id.* at 12, and that portions of L.V.'s progress report submitted by LFLG "appear[ed] to be cut-and-pasted from any number of other students' reports to the point that they are incomprehensible and cannot be relied on for any accurate information." *Id.* And although Fiallos had sought nearly $550,000 in reimbursement for transportation and nursing services, the IHO wrote that "there [was] no proof that the services contracted for . . . were provided" as "the Deputy Director [of iBrain] testified

that they had no knowledge of who provided the services nor did any records of the services exist." *Id.* at 14. Indeed, it was not even clear to the IHO whether Fiallos had in fact signed the relevant contracts. *See id.* at 5 & nn. 31, 33, 35. The record does not reflect whether iBrain appealed the IHO's decision within the administrative system, let alone to federal court.

**E. Procedural Background**

LFLG filed suit on behalf of Fiallos only days after it filed her DPC — almost two months before the IHO entered a pendency order. Specifically, on July 18, 2025, LFLG filed a lawsuit on behalf of fifteen plaintiffs — including Fiallos — seeking declaratory and injunctive relief. *See Frias v. Aviles-Ramos*, 25-CV-5936 (JPC) (S.D.N.Y. July 18, 2025), ECF No. 1 ("*Frias* Compl."), at 41-43. Shortly thereafter, LFLG filed a motion for emergency relief. *See Frias*, 25-CV-5936 (S.D.N.Y. Aug. 22, 2025), ECF No. 18. On August 29, 2025, however, the Honorable John P. Cronan dismissed the claims of all the plaintiffs in that case — including Fiallos — save the lead plaintiff, on the ground that the plaintiffs' claims had been "improperly joined." *Frias v. Aviles-Ramos*, No. 25-CV-5936 (JPC), 2025 WL 2494336, at *3 (S.D.N.Y. Aug. 29, 2025). Judge Cronan dismissed the claims of Fiallos and the other plaintiffs "without prejudice to those Plaintiffs refiling each of their claims in a separate civil action." *Id.* at *4.

Four days later, LFLG filed this case on behalf of Fiallos and the other thirteen plaintiffs dismissed from *Frias*, alleging (as it had in *Frias*) that joinder was proper pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure, *see* ECF No. 1, ¶¶ 374-75; *see also Frias* Compl. ¶¶ 232-33 — but, troublingly, making no mention of Judge Cronan's decision in *Frias*. On September 5, 2025, the Court ordered Plaintiffs to either "show cause . . . why all Plaintiffs in this case other than Alexandra Fiallos should not be severed or their claims dismissed" or to "inform the Court by letter that they consent to severance." ECF No. 16, at 1. On September 9,

2025, LFLG filed a letter consenting to severance, ECF No. 17, and, on September 10, 2025, the Court dismissed claims by all Plaintiffs save Fiallos "without prejudice to the filing of new, separate, lawsuits by the dismissed plaintiffs." ECF No. 19.[8]

At or about the same time, LFLG filed three separate "emergency" motions for injunctive relief in quick succession. In the first emergency motion, filed on September 4, 2025, it asked the Court to "direct[] DOE . . . to either conclude the due process proceedings in accordance with the expedited timelines or, in the alternative, find that DOE per se failed to provide a FAPE" to L.V. by failing to adhere to statutory timelines. ECF No. 8 ("Pl.'s First Mem."), at 25. On September 15, 2025, while that motion was still pending, LFLG filed a second "emergency" motion, asking the Court to direct the DOE to make payments pursuant to the IHO's pendency order in "a reasonable time period." ECF No. 25 ("Pl.'s Second Mem."), at 16. Two days later, the DOE served LFLG with notice that it intended to move for sanctions unless LFLG withdrew the two "emergency" motions it had just filed. *See* ECF No. 57-1 ("Safe Harbor"), at 5, 12.

---

[8] On September 11, 2025, the thirteen plaintiffs dismissed from this case refiled their own cases. Somewhat remarkably (given Judge Cronan's ruling and this Court's Order to Show Cause), they did not do so in thirteen separate lawsuits. Instead, Plaintiff's counsel filed four new lawsuits, each with multiple plaintiffs purporting, once again, to be properly joined under Rule 20(a)(1). *See Davis v. Aviles-Ramos*, 25-CV-7555 (KPF) (S.D.N.Y. Sept. 11, 2025), ECF No. 1, ¶¶ 155-58; *Zayas v. Aviles-Ramos*, 25-CV-7561 (AT) (S.D.N.Y. Sept. 11, 2025), ECF No. 1, ¶¶ 187-90; *Crespo v. Aviles-Ramos*, 25-CV-7563 (JAV) (S.D.N.Y. Sept. 11, 2025), ECF No. 1, ¶¶ 128-31; *Nicholls v. Aviles-Ramos*, 25-CV-7569 (JPO) (S.D.N.Y. Sept. 11, 2025), ECF No. 1, ¶¶ 170-73. In each case, as in this one, the plaintiffs filed multiple requests for emergency relief. *See Davis*, 25-CV-7555 (S.D.N.Y. Sept. 15, 2025), ECF Nos. 6, 11; *Zayas*, 25-CV-7561 (S.D.N.Y. Sept. 16, 2026), ECF Nos. 6, 13; *Crespo*, 25-CV-7563 (S.D.N.Y. Sept. 15, 2025), ECF Nos. 6, 13, 25; *Nicholls*, 25-CV-7569 (S.D.N.Y. Sept. 15, 2025), ECF Nos. 7, 13. And in each case, as in this one, their requests for immediate pendency payments were denied. *See Davis*, 25-CV-7555 (S.D.N.Y. Nov. 21, 2025), ECF No. 32; *Zayas*, 25-CV-7561 (S.D.N.Y. Dec. 1, 2025), ECF Nos. 33, 43; *Crespo*, 25-CV-7563 (S.D.N.Y. Sept. 19, 2025), ECF No. 21, 38; *Nicholls*, 25-CV-7569 (S.D.N.Y. Oct. 27, 2025), ECF Nos. 25, 52.

In a telephone conference held on September 18, 2025, the Court summarily denied LFLG's second "emergency" motion on the ground that it was squarely foreclosed by the Second Circuit's decision in *Mendez*. *See* ECF No. 61 ("Tr."), at 25; *see also* ECF No. 31.[9] Notwithstanding that ruling, LFLG filed a *third* "emergency" motion on October 9, 2025, seeking the very same relief, this time with additional allegations that the DOE's failure to make pendency payments placed "the entire iBRAIN program [] at imminent risk of closing." ECF No. 41 ("Pl.'s Third Mem."); *see also* ECF No. 42 ("Sebbag Decl."), ¶ 23 (statement of iBrain's Chief Operating Officer asserting that "[w]ithout immediate relief, iBRAIN will be unable to meet its payroll obligations," which "exceed[] $1,000,000" monthly"). By Memorandum Opinion and Order entered the next day, the Court summarily denied LFLG's request for a temporary restraining order ("TRO"), noting that its new allegations were "hard to credit given that, just weeks [before]," LFLG had "conceded on the record that there was no evidence that [L.V.]'s placement at iBrain was at risk . . . and implied that iBrain could go [several] months without payment before there was any risk of it shutting down or the student being evicted." ECF No. 44, at 2 (internal quotation marks omitted). The Court reserved judgment on the motion for a preliminary injunction, observing that LFLG's motion had "put[] iBrain's financial circumstances and health at issue," *id.*, and authorizing limited discovery into iBrain's financial condition, *see* ECF No. 48.

On October 20, 2025, the Court issued an Opinion and Order denying LFLG's first emergency motion on the grounds that it had failed to show that Fiallos's child would suffer irreparable harm absent injunctive relief and that the motion was "little more than an attempt to

9 LFLG filed an interlocutory appeal of that denial, *see* ECF No. 33, but thereafter withdrew it after it voluntarily dismissed this case, *see* ECF No. 60.

circumvent the ordinary procedures that apply to IDEA claims." *Fiallos*, 2025 WL 2961624, at *6 (cleaned up).[10] In that Opinion, the Court recounted LFLG's "long history of questionable conduct in this Circuit," which had led courts to "routinely den[y] [LFLG]'s regular requests for emergency preliminary relief," many of which had "been borderline frivolous." *Id.* at *5. One day later, LFLG filed a letter informing the Court that it had apparently received most of the pendency payments it had sought and was "consider[ing] withdrawing [its] latest motion for preliminary injunction." ECF No. 51. At a conference held the same day, however, the Court ordered discovery into iBrain's financial circumstances to proceed. *See* ECF No. 53.

Two days later, on October 23, 2025, LFLG withdrew its third motion for a preliminary injunction, *see* ECF No. 54, and voluntarily dismissed this case pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, *see* ECF No. 55. The Court so ordered the dismissal but noted that it "retain[ed] jurisdiction to address any request for sanctions." ECF No. 58. That same day, the DOE filed a letter informing the Court that it intended to seek sanctions against LFLG and proposed a briefing schedule for a motion, which the Court adopted. *See* ECF Nos. 57, 59. On November 4, 2025, LFLG filed a letter requesting that the Court revisit its decision to set a briefing schedule on the motion for sanctions but did not style that letter as a motion for reconsideration. *See* ECF No. 63. Two days later, LFLG filed an interlocutory appeal to the Second Circuit, apparently appealing: (1) the Court's October 23, 2025 endorsement noting that it had retained jurisdiction to entertain a motion for sanctions; and (2) the Court's purported "failure to rule on [LFLG's] motion for reconsideration." ECF No. 66. The Court ordered that briefing on the motion for sanctions continue as previously scheduled and directed the parties to

[10] As noted above, the IHO had actually ruled on Fiallos's DPC five days before the Court entered its Opinion and Order, arguably mooting LFLG's first "emergency" motion. But neither side alerted the Court to that development.

address whether LFLG's attempt to file a frivolous appeal to halt this Court's proceedings was, in itself, sanctionable conduct. *See* ECF No. 67.

On November 14, 2025, the DOE filed its motion for sanctions. *See* ECF No. 70. The DOE argues that LFLG's first two "emergency" motions for injunctive relief were sanctionable under Rule 11(b)(2) of the Federal Rules of Civil Procedure because they relied on frivolous legal arguments. *See* Defs.' Mem. 21-24. And it argues that all three motions were sanctionable under Rules 11(b)(1) and 11(b)(3) because they were inappropriately styled as "emergency" motions and were submitted for the improper purpose of harassing the DOE. *See id.* at 25-27. It also argues that LFLG should also be sanctioned pursuant to 28 U.S.C. § 1927. *Id.* at 26. On January 2, 2026, one of LFLG's attorneys — Nicole Lancia — filed a motion to withdraw from the case because she had left LFLG. *See* ECF No. 83. The Court granted that motion but noted that it retained jurisdiction to impose sanctions on Lancia if and as appropriate. *See* ECF No. 84. Since that time, Lancia has returned to LFLG, *see Donohue v. Samuels*, No. 26-CV-5329 (JMF) (S.D.N.Y. June 29, 2026), ECF No. 17 (entering a notice of appearance), although she has not, as of this date, entered a new notice of appearance in this case.[11]

---

[11] To the Court's knowledge, LFLG failed to obtain a single court order requiring immediate pendency payments in the slew of cases that it filed at or about the time it initiated this case. Most, if not all, courts concluded, as this one did, that LFLG's "emergency" motions for accelerated payments were foreclosed by the Second Circuit's decision in *Mendez*. In the wake of that failure, it appears that iBrain and LFLG have adopted a new strategy. Just weeks ago, LFLG filed at least fifty new cases in this District on behalf of iBrain parents whose children have not yet received pendency orders. In each case, LFLG seeks emergency injunctive relief in the form of an order "directing [the DOE] to maintain, implement *and fund* [the] Student's pendency placement no later than 35 days from July 1, 2026 . . . ." *Donohue v. Samuels*, No. 26-CV-5329 (JMF) (S.D.N.Y. June 26, 2026), ECF No. 6 (emphasis added). That language, in turn, is pulled directly from iBrain's new enrollment agreement, which now states that a student will not be permitted to attend iBrain unless his or her parent pays approximately $200,000 or "obtain[s] a state or federal order on or before July 1, 2026, directing the local school district to fund [the] Student's pendency placement at iBRAIN, . . . no later than thirty-five (35) days after July 1, 2026." *Id.*, ECF No. 8-1, at E-003. Relying on that new contractual

## DISCUSSION

As noted, the DOE moves for sanctions pursuant to Rule 11 and Section 1927. The Court will analyze each proffered basis for sanctions in turn.

### A. Rule 11

As relevant here, Rule 11(b) of the Federal Rules of Civil Procedure provides as follows:

> By presenting to the court a pleading, written motion, or other paper . . . [,] an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

FED. R. CIV. P. 11(b). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1). By its terms, Rule 11 is focused on "specific filing[s]." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 553 (1991). Thus, "[b]road findings of frivolous

---

provision, LFLG argues that these requests, unlike its earlier attempts, satisfy the requirements in *Mendez* because, absent an emergency order, the student's placement at iBrain is in jeopardy. By coincidence, the first of these new cases, brought by Donohue himself, was assigned to the undersigned and, on consent of the parties, all the others have since been reassigned and consolidated with it, at least for purposes of resolving LFLG's motions for emergency relief. *See Donohue*, No. 26-CV-5329 (S.D.N.Y. June 30, 2026), ECF No. 18. On June 30, 2026, the Court granted LFLG's request for a temporary restraining order, *id.*, granted limited discovery into the drafting and understanding of the new contractual language, and scheduled a preliminary injunction hearing for July 30, 2026. The Court reserves judgment on all of those motions.

litigation, dilatory tactics, or bad faith are insufficient to support the award of sanctions under Rule 11." *Coltrade Int'l, Inc. v. United States*, 973 F.2d 128, 131 (2d Cir. 1992).

Significantly, a party seeking sanctions pursuant to Rule 11 must generally comply with strict procedural requirements. *See Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175-76 (2d Cir. 2012). Most relevant here, Rule 11 contains a "safe harbor" provision requiring that a moving party, first, provide notice and a draft of its planned motion for sanctions to the non-moving party and, second, give the non-moving party twenty-one days before filing the motion, during which time the non-moving party has an opportunity to withdraw the offending document or take appropriate corrective action. *See* FED. R. CIV. P. 11(c)(2) ("The motion must be served . . . , but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). "A motion that fails to comply with the safe harbor provision of Rule 11 *must* be denied." *Castro v. Mitchell*, 727 F. Supp. 2d 302, 306 (S.D.N.Y. 2010) (emphasis added) (collecting cases).

Here, the DOE seeks Rule 11 sanctions based on three specific filings by LFLG, namely the "emergency" motions filed on September 4, 2025, ECF No. 5; September 15, 2025, ECF No. 22; and October 9, 2025, ECF No. 40. The DOE argues that the first two motions are sanctionable under Rule 11(b)(2) because they were based on frivolous arguments squarely foreclosed by Second Circuit precedent. *See* Defs.' Mem. 21-25. And it argues that all three motions are independently sanctionable under Rules 11(b)(1) and 11(b)(3) because they were improperly styled as "emergency" motions and were submitted for the improper purpose of harassing the DOE. *See id.* at 25-27. The Court will address each alleged violation in turn.

**1. Rule 11(b)(2)**

The DOE contends that LFLG's first two motions for "emergency" injunctive relief were based on frivolous legal arguments, and thus sanctionable, because the relief they sought was squarely foreclosed by the Second Circuit in a case — *Mendez* — that LFLG itself argued and lost. *See* Defs.' Mem. 21-25. "[T]o constitute a frivolous legal position for purposes of Rule 11[(b)(2)] sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend . . . the law as it stands." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990). "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable." *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011).

Measured against these standards, LFLG's first motion for emergency injunctive relief is not sanctionable. The crux of that motion was LFLG's argument that Fiallos's procedural rights had been violated by the IHO's failure to adjudicate her DPC within a statutorily prescribed timeline. *See* Pl.'s First Mem. 18-19. LFLG thus sought an order compelling the DOE to expedite resolution of her claim by requiring the IHO to hold a DPC hearing. *See id.* at 6-7. The Court ultimately denied the motion, primarily on the ground that LFLG had failed to demonstrate that Fiallos would suffer irreparable harm absent an injunction. *See Fiallos*, 2025 WL 2961624, at *3-4. The Court noted that LFLG's argument to the contrary "rest[ed] on the premise that a failure to timely comply with the procedural requirements of the IDEA [was] itself a *per se* denial of FAPE" and reasoned that such a "bare procedural violation" alone was insufficient to satisfy the injury-in-fact requirement for Article III standing and, *a fortiori*, insufficient to demonstrate irreparable harm. *Id.* at *4. The DOE maintains that this requested relief is only "superficially" different than the relief rejected in *Mendez* and is thus frivolous. *See* Defs.' Mem. 22-23. But that is not correct. In *Mendez*, the Second Circuit held that the IDEA "does

not create an entitlement to immediate payment or reimbursement" absent a showing "that a delay or failure to pay has jeopardized [a] child's educational placement." *Mendez*, 65 F.4th at 63. It did not address the question of whether the IDEA entitles a parent to an injunction directing expedited proceedings before the IHO when the DOE fails to meet certain procedural requirements, which is the relief LFLG sought in its first motion. To be sure, this Court ultimately concluded that that request was not likely to succeed on the merits because the IDEA permits IHOs to extend deadlines and provides other remedies for procedural violations, *see Fiallos*, 2025 WL 2961624, at *6, but, absent binding precedent, "[t]he fact that a legal theory is a long-shot does not necessarily mean it is sanctionable." *Fishoff*, 634 F.3d at 654.

Substantively, LFLG's second "emergency" motion was far more problematic. In that motion, LFLG asked the Court to "order[] the DOE to fully fund tuition, transportation, and nursing services" in accordance with the terms of the pendency order issued by the IHO, ECF No. 22, within a "reasonable time period," Pl.'s Second Mem. 16. And again, it argued that it was entitled to such an injunction "irrespective of whether [Fiallos] can show irreparable harm." *Id.* at 10. As one of the LFLG lawyers — Rory Bellantoni — conceded, however, there was no evidence in the record that the DOE's failure to pay at that time "jeopardized the student's [] educational placement at iBrain." Tr. 15. Moreover, Bellantoni expressly represented that iBrain could continue operating for "four months, five months, six months" without the pendency payments. *Id.* at 16. Thus, LFLG's second "emergency" motion was plainly an attempt to force the DOE to "circumvent its ordinary payment procedures" without providing evidence that the student's placement was in jeopardy. *Mendez*, 65 F.4th at 63. It was therefore squarely foreclosed by the Second Circuit's binding decision in *Mendez*. 65 F.4th at 63; *see also* Tr. 17 (noting that LFLG was arguing and asking for precisely the relief barred by *Mendez*).

LFLG's attempts to resist that conclusion are little more than hairsplitting. It argues that there is a distinction between an order that requires the DOE to "fund" a student's programs (which is what it sought in this case) and one that requires the DOE to "pay" funds. Pl.'s Opp'n 26. The former, it argues, only "creates an obligation to cover program costs, but leaves timing, mechanism, and reimbursement details to be determined," while the latter "requires [the DOE] to immediately disburse funds." *Id.* It argues that *Mendez* foreclosed only the latter type of relief. *See id.* But that is nonsense. The *Mendez* Court itself stated that "funding goes hand-in-hand with placement" and that "the DOE is obliged to fund . . . children's educational placements for the duration of the proceedings." 65 F.4th at 62. And all parties in this case agreed that the DOE was obligated to fund L.V.'s placement "for the duration of the proceedings" under the terms of the pendency order entered by the IHO. *See* ECF No. 82 ("Defs.' Reply"), at 5.[12] Accordingly, there was no need for any injunctive relief to establish such an obligation. The only issue was one of timing — and on that issue, *Mendez* was dispositive.

LFLG's post hoc attempt to spin its motion as merely seeking payments in the ordinary course is also belied by the fact that it characterized the motion as an "emergency." The arguments LFLG made in support of the motion simply reinforce that conclusion. For example, LFLG complained that the DOE's failure to pay apparently violated the terms of a settlement agreement it had signed in unrelated litigation committing it to implement IHO-issued orders

---

[12] That fact distinguishes this case from those that LFLG cites as examples of its "successes" in securing injunctive relief after *Mendez*. *See* Pl.'s Opp'n 30-31. In *Crespo v. Aviles-Ramos*, No. 25-CV-7563 (JAV), 2025 WL 3022389, at *5 (S.D.N.Y. Oct. 29, 2025), *appeal docketed*, No. 26-127 (2d Cir. Jan. 21, 2026), the DOE disputed its obligations to make pendency payments while appeals of the pendency orders were pending. And in *Moonsammy v. Banks*, No. 24-CV-2616 (PAE), 2024 WL 2831042, at *5 (S.D.N.Y. June 3, 2024), there was no pendency order, casting doubt on the DOE's obligations. Notably, in each case, the court still denied LFLG's request for expedited payment of pendency funds. *See Crespo*, 2025 WL 3022389, at *8; *Moonsammy*, 2024 WL 2831042, at *7.

within a certain timeframe. *See* Pl.'s Second Mem. 16. Additionally, it argued that the DOE had previously testified that its "normal due course" for issuing payments was to make them "the same day or within a day" of authorization and that it had failed to do so in this case. *Id.* Put differently (and at the risk of repetition), LFLG filed its second "emergency" motion to jump the queue — i.e., to get the DOE to "circumvent its ordinary payment procedures" and make payments to iBrain more quickly. *Mendez*, 65 F.4th at 63. But *Mendez* made it crystal clear that the mere fact that LFLG (or iBrain or the parent) viewed the DOE's timelines as unreasonable is insufficient to justify emergency injunctive relief.

As a fallback position, LFLG argues that it cannot be sanctioned for making this argument because another judge in this District considering an identical request — the Honorable Katherine P. Failla — stated at a status conference that, although she would deny the request, she was "not yet ready" to declare the request sanctionable "because the Second Circuit [hadn't] spoken on the issue." *See* ECF No. 79-6 ("*Bruckauf* Tr."), at 19-20. LFLG represents that it "relied on Judge Failla's comments" in bringing identical claims in this and other cases. Pl.'s Opp'n 30. But that argument fails on a number of levels. First, Judge Failla, did not, as LFLG asserts, "reject[]" the notion that sanctions could be appropriate. *Id.* at 29. Instead, she expressed preliminary doubts to that effect and recognized that the DOE "may be ultimately able to persuade [her]" that sanctions on LFLG were warranted. *Bruckauf* Tr. 22. Second, to the extent that Judge Failla expressed doubts about the reach of *Mendez*, a later decision by the Second Circuit confirms that those doubts were misplaced. In a summary order issued on May 14, 2026, the Second Circuit affirmed denials of essentially identical requests brought by LFLG, seeking "pendency funding in the ordinary course of business without undue delay." *Ramos*, 2026 WL 1346852, at *1. The Second Circuit noted that these arguments were "substantially the

same" as those that LFLG had made in *Mendez* and held that *Mendez* controlled. *See id.* at *3 ("To repeat our holding in *Mendez*, 'the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement,' and 'DOE must first withhold payments that have actually accrued before [p]laintiffs can seek those payments in court.'" (quoting *Mendez*, 65 F.4th at 61, 63)). That decision by the Second Circuit reinforces what this Court has already concluded on multiple occasions: that LFLG's second request for injunctive relief was squarely foreclosed by *Mendez* at the time it was made and that its arguments in favor of such a request were therefore frivolous.

In short, LFLG's second "emergency" motion was frivolous within the meaning of Rule 11(b)(2). That said, Rule 11(c)(2), the "safe harbor" provision, precludes the Court from imposing sanctions on LFLG for filing it. As already noted, the DOE sent LFLG a letter on September 17, 2025, providing notice of its intent to seek Rule 11 sanctions if the firm did not withdraw the second "emergency" motion within twenty-one days — i.e., by October 8, 2025. *See* Safe Harbor 9, 11. But the Court, on its own initiative, denied LFLG's motion on September 18, 2025, just days after it was filed, well before the safe-harbor period ended. *See* ECF No. 31. Several appellate courts have held that courts may not grant a motion for Rule 11 sanctions in such circumstances. *See Ridder v. City of Springfield*, 109 F.3d 288, 295 (6th Cir. 1997) ("If the court disposes of the offending contention before the twenty-one day 'safe harbor' period expires, a motion for sanctions cannot be filed with or presented to the court."); *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008) ("The service and filing of a motion for sanctions must occur prior to final judgment or judicial rejection of the offending motion." (cleaned up)); *see also* 5A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1337.2 (4th ed. 2008) ("Even if a motion for Rule 11 sanctions is served before the disposition of the claim, the motion will be

rejected if the court disposes of the offending contention before twenty-one days have passed since the time the papers invoking the sanction provision were served, because the party has not been afforded the full twenty-one days to withdraw the challenged document."). The Second Circuit has not explicitly adopted that view, but the court has suggested in dicta that it comports with the purposes of the safe-harbor provision. *See In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 n.2 (2d Cir. 2003) (noting that the safe-harbor requirement "has been interpreted to mean that Rule 11 motions must be served at least a full 21 days before the court . . . resolves the offending contention"). Accordingly, albeit not without misgivings, the Court denies DOE's motion for sanctions pursuant to Rule 11(b)(2).

**2. Rule 11(b)(1) and Rule 11(b)(3)**

As noted, the DOE separately seeks sanctions as to all three of LFLG's motions under Rules 11(b)(1) and 11(b)(3) on the ground that they were made without any evidentiary support for the contention that relief was required on an "emergency" basis and for the improper purpose of harassing the DOE. *See* Defs.' Mem. 25-27. Here too, the Rule 11(c)(2) "safe harbor" requirement precludes the DOE's arguments with respect to the second and third "emergency" motions. As discussed, the Court denied LFLG's second motion before the safe-harbor period lapsed, and the DOE did not send a safe-harbor letter at all with respect to LFLG's third motion, which was, in any case, withdrawn within twenty-one days of being filed. *See* ECF No. 54. By contrast, the DOE sent LFLG a safe harbor letter with respect to the first "emergency" motion on September 17, 2025, *see* Safe Harbor 2-8; LFLG did not withdraw it within the next twenty-one days (or ever); and the Court did not deny it until October 20, 2025, *see* ECF No. 49.

The Court begins with Rule 11(b)(3), which, in relevant part, requires that factual contentions in a filing "have evidentiary support." Sanctions may not be imposed on that basis,

however, "unless a particular allegation is utterly lacking in support." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d Cir. 2003) (Sotomayor, J.) (cleaned up). Conspicuously, LFLG's opposition brief does not even address whether it had any evidentiary support for making the claim that its first motion constituted an emergency. It has therefore conceded the DOE's point. *See Scott v. JPMorgan Chase & Co.*, No. 13-CV-646 (KPF), 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) (collecting cases to conclude that when a party's "[m]emorandum of [l]aw does not respond to [an] argument, [the party] effectively concedes these arguments by [its] failure to respond to them" (citation omitted)), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) (summary order). But even if LFLG did not concede the point, the record makes plain that there was no evidentiary support for the firm's factual contention that there was an "emergency." As already noted, Fiallos's contract with iBrain "appear[ed] to guarantee [her child's] placement at iBrain pending adjudication of her DPC," whether or not the IHO had convened a hearing or issued a pendency order at the time the motion was filed. *Fiallos*, 2025 WL 2961624, at *4. Accordingly, LFLG did not provide even a scintilla of evidentiary support for its contention that it required emergency relief from the IHO's failure to convene a hearing, and its filing is sanctionable on that basis as violative of Rule 11(b)(3).

That leaves whether the motion is also sanctionable under Rule 11(b)(1) for being filed for improper purpose. "Analysis under Rule 11(b)(1) inquiry is often intertwined with analysis of the substantive validity of a party's claims." *Black v. Ganieva*, No. 21-CV-8824 (PAE), 2022 WL 2354916, at *11 (S.D.N.Y. June 30, 2022). Courts may infer an improper purpose when, for example, a party brings "weak claims and abrupt[ly] changes course," *id.* at *13 (citing *S. Pac. Shipping Co. v. Redi-Fresh Produce Inc.*, No. 14-CV-4157 (LAK) (AJP), 2014 WL 6968039, at *10 (S.D.N.Y. Dec. 9, 2014)), or when a litigant makes "multiplicative filings [that] are coupled

with 'objectively unreasonable statements,'" *LCS Grp., LLC v. Shire LLC*, No. 18-CV-2688 (AT), 2019 WL 1234848, at *14 (S.D.N.Y. Mar. 8, 2019) (cleaned up). "But, where a complaint 'is not held to lack foundation in law or fact,' the 'filing of the complaint with a view to exerting pressure on defendants through the generation of adverse and economically disadvantageous publicity' is insufficient to show improper purpose." *Ganieva*, 2022 WL 2354916, at *11 (quoting *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)).

Measured against these standards, the Court finds that LFLG filed its first "emergency" motion for the improper purpose of harassing the DOE. Several aspects of the filing itself, as well as LFLG's behavior more broadly, support that inference. First, LFLG's purported basis for injunctive relief was incredibly weak. As the Court noted in its October 20, 2025 Opinion, LFLG failed to provide *any* support for its claims that Fiallos would suffer irreparable harm absent injunctive relief and cited only inapposite caselaw in support of its argument that it "need not put forth a substantial amount of evidence of irreparable injury because such injury is obvious." *Fiallos*, 2025 WL 2961624, at *3 (cleaned up). At bottom, LFLG's merits argument amounted to "little more than an effort to appeal an IHO's seemingly routine decision to grant an extension of the compliance date for [the] claim," and LFLG cited no authority that such an extension amounted to a *per se* denial of the child's placement. *Id.* at *6.

Second, even before its first motion was adjudicated, LFLG "abrupt[ly] change[d] course," *Ganieva*, 2022 WL 2354916, at *13, and began filing "multiplicative filings," *Shire*, 2019 WL 1234848, at *14, seeking relief in the form of payments that, as discussed, were clearly barred under *Mendez*. Making matters worse, LFLG did not even notify the Court — let alone withdraw its motion — when the IHO scheduled and held the DPC hearing on September 15, 2025, *see* ECF No. 50-1, which was precisely the relief it claimed to be seeking in the first

place.[13] Finally, and perhaps most damningly, LFLG forthrightly admits in its opposition to the DOE's present motion that it frequently "brings multiple actions in a relatively short time" because, "[a]fter the requests for TROs/PIs are made, the [DOE] begrudgingly begin[s] funding each pendency placement." Pl.'s Opp'n 27. That pattern of activity, combined with the weak claims asserted by LFLG in its first motion, leads the Court to conclude that LFLG filed it for the improper purpose of harassing the DOE into "circumvent[ing] the ordinary procedures that apply to IDEA claims." *Fiallos*, 2025 WL 2961624, at *6 (cleaned up). It is therefore sanctionable on that basis as well.

In short, the DOE's motion for sanctions under Rule 11(b)(1) and 11(b)(3) is GRANTED to the extent it is premised on LFLG's first "emergency" motion. The Court discusses the appropriate sanctions for these violations below.

**B. Section 1927**

Separately, the DOE argues that LFLG violated Section 1927, which provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be

---

[13] Nor did LFLG notify the Court when, on October 15, 2025, the IHO issued a ruling on the merits, rejecting Fiallos's request for $937,301.25 in its entirety. As noted, the IHO observed that the "record [was] devoid of any information as to the curriculum, schedule or attendance records of [L.V.] at [iBrain]," *see* ECF No. 50-1, at 12, and that portions of L.V.'s progress report submitted by LFLG "appear[ed] to be cut-and-pasted from any number of other students' reports to the point that they are incomprehensible and cannot be relied on for any accurate information." *Id.* And although Fiallos had sought nearly $550,000 in reimbursement for transportation and nursing services, the IHO wrote that "there [was] no proof that the services contracted for . . . were provided" as "the Deputy Director [of iBrain] testified that they had no knowledge of who provided the services nor did any records of the services exist." *Id.* at 14. Despite that outcome, Fiallos and, by extension, iBrain, Sisters Travel, B&H Healthcare, and LFLG are entitled to keep whatever pendency payments the DOE has made; in fact, the DOE is obligated to continue making those payments until Fiallos has exhausted all appeals. *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014). As noted, that quirk of the IDEA is surely what explains LFLG's relentless campaign to secure pendency payments as quickly as possible.

required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *see also* Defs.' Mem. 21, 26.

There are several relevant differences between Rule 11 and Section 1927. First, while Rule 11 imposes obligations on a party's filings, "Section 1927 violations do not hinge on the presence of a paper." *Diamond v. Simon*, 89-CV-7061 (PKL), 1992 WL 15046, at *3 (S.D.N.Y. Jan. 17, 1992). Second, while "misconduct under Rule 11 must be judged as of the time the paper was signed, . . . [Section] 1927 invites attention to a course of conduct." *Id.* Thus, to be entitled to costs and fees under Section 1927, a party must provide "clear evidence that '(1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith — that is, motivated by improper purposes such as harassment or delay.'" *United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 479 (S.D.N.Y. 2018) (quoting *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000)). A "claim is entirely without color when it lacks any legal or factual basis." *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (emphasis and internal quotation marks omitted)). And to find bad faith, a court must (1) find that the challenged actions were taken for improper purposes, such as harassment or delay; and (2) provide a high degree of specificity in its factual findings. *See Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986). Courts may infer bad faith if a party's actions are "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer Nance*, 194 F.3d at 336 (internal quotation marks omitted).

Measured against these standards, the Court has little trouble concluding that LFLG's conduct in this litigation violated Section 1927. To begin with, as the discussion above makes plain, LFLG initiated this litigation with a flurry of multiplicitous "emergency" motions that

were entirely without color, which is to say they "lack[ed] any legal or factual basis." *Id.* at 337. As discussed, LFLG's first motion for injunctive relief seeking an expedited IHO hearing was filed without *any* evidentiary support for the contention that emergency relief was warranted. And while that motion was still pending, LFLG filed a second frivolous "emergency" motion seeking pendency payments that was squarely foreclosed by the Second Circuit's binding decision in *Mendez*. Finally, just weeks later, LFLG filed a third "emergency" motion that was nearly identical to its second motion, *see* ECF No. 45-1 (redline of second and third motions), except that it purported to contain allegations to satisfy the requirement articulated in *Mendez* that a plaintiff seeking an injunction show "that a delay or failure to pay has jeopardized [a] child's educational placement." *Mendez*, 65 F.4th at 63. Ignoring Bellantoni's representation — made just one month prior — that iBrain could continue operating for "four months, five months, six months" without the requested pendency payments, Tr. 16, LFLG claimed that iBrain was in severe financial distress and at immediate risk of shutting down if it did not receive the payments right away. *See* Pl.'s Third Mem. 11. But when it became clear that the Court planned to require LFLG to substantiate its allegations with evidence, LFLG not only withdrew the motion, *see* ECF No. 54, but also voluntarily dismissed the entire case, *see* ECF No. 55, preventing the Court from determining whether there was any factual basis for its claim.

Based on the lack of merit of LFLG's motions alone, the Court can and does infer that LFLG's flurry of filings were made in bad faith for the improper purpose of harassing the DOE into short-circuiting its administrative procedures. *See Schlaifer Nance*, 194 F.3d at 336. That inference is reinforced by the fact that LFLG has consistently employed these sorts of tactics in dozens of cases in this District and the Eastern District of New York. Between 2019 and November 2025, LFLG filed at least *131* "emergency" motions for injunctive relief, nearly all of

which were denied on the merits, denied as moot, or withdrawn by the firm. *See* ECF No. 57, at 3; *see also* ECF No. 57-2 (listing those motions). Even more remarkably, the majority of those filings — seventy-seven in total — came *after* the Second Circuit made it clear in *Mendez* (which LFLG itself had argued and lost) that the IDEA did not entitle litigants to short-circuit the DOE's administrative procedures without evidence that a student's placement was actually at risk. *See* Pantalony Decl. ¶ 11. Given that, between June 2023 and November 2025, LFLG's filings accounted for more than 80% of *all* emergency filings in cases involving the IDEA, when the fifty to sixty students enrolled in iBrain accounted for fewer than 0.5% of all DPCs in New York City, *see id.* ¶¶ 5-8, 11, the only reasonable inference is that LFLG was acting in bad faith to secure gains it could not achieve through meritorious litigation.

Finally, that conclusion is further reinforced by LFLG's repeated attempts, in this case and others, to evade and frustrate the Second Circuit's decision in *Mendez*. First, it has superficially characterized its motions as requests for pendency funding in a "reasonable time period" and purported to disclaim any entitlement to immediate payments, *see* Pl.'s Second Mem. 16, but has entirely failed to substantiate why the students it represents would suffer irreparable harm absent injunctive relief and, thus, why its requests should constitute "emergencies." The Second Circuit easily saw through this façade and denied the argument in *Ramos* as squarely controlled by *Mendez*. *See Ramos*, 2026 WL 1346852, at *3. Second, LFLG has made allegations that the DOE's delays in making payments jeopardize iBrain's ability to operate in an attempt to satisfy the requirements articulated in *Mendez*, but it has withdrawn its motions rather than respond to discovery requests that could substantiate them. *See, e.g.*, ECF No. 55; *Frias v. Aviles-Ramos*, 25-CV-5936 (JPC) (S.D.N.Y. Oct. 24, 2025), ECF No. 45. In this case, LFLG attempted to explain that withdrawal on the ground that the DOE had released

some, but not all, of the requested pendency payments shortly after its motion was filed, *see* ECF No. 54, but that does not explain why it dismissed the case in its entirety and, as Judge McMahon has noted, "suggests that iBRAIN is not in imminent financial danger — or, perhaps, that it has other reasons for not wanting a court to explore its finances." *Mendez*, 2025 WL 3033725, at *2.[14]

For all of these reasons, the Court finds that LFLG multiplied these proceedings "unreasonably and vexatiously" and, thus, should be sanctioned for violating Section 1927. That provision requires an offending attorney to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Here, that amounts to all of the attorney's fees and costs that the DOE incurred in defending against LFLG's repeated "emergency" motions for injunctive relief and all the subsequent litigation that flowed from those motions, including the fees and costs associated with this motion. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 109 (2017) (holding that "[t]he complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct.").[15]

[14] Notably, when faced with similar behavior, Judge McMahon ordered discovery into the financial condition of iBrain and Sisters Travel and stated that she intended to *sua sponte* issue an order to show cause regarding sanctions if LFLG withdrew its preliminary injunction motion. *See Mendez v. Aviles-Ramos*, No. 25-CV-5746 (CM), 2025 WL 3033725, at *4 (S.D.N.Y. Oct. 30, 2025). Discovery into those matters has since been referred to Magistrate Judge Sarah L. Cave and consolidated with two other cases in which judges in this District ordered substantially similar discovery to occur. *See Mendez*, 25-CV-5746 (S.D.N.Y. May 14, 2026), ECF Nos. 99, 102. The latest status report filed by the parties indicates that discovery is still ongoing. *Id.*, (S.D.N.Y. July 1, 2026), ECF No. 108.

[15] That award is appropriate even though the Court rejected some aspects of the DOE's sanctions motion. *See Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 288 (2d Cir. 2021) ("[W]e hold it was not an abuse of discretion for the district court to hold [a party] liable for the cost of litigating the entire sanctions motion even when this motion was successful only in part.").

**C. Appropriate Sanctions**

Having determined that LFLG should be made to reimburse the DOE for all of its attorneys' fees and costs associated with defending against the emergency motions and the motion for sanctions pursuant to Section 1927, the Court need not separately consider whether or to what extent to award fees and costs for LFLG's violations of Rule 11 in connection with its first "emergency" motion. That said, courts have "significant discretion to determine what sanction, if any, is appropriate for a particular violation of Rule 11," *Edmonds v. Seavey*, No. 08-CV-5646 (HB), 2009 WL 4404815, at *4 (S.D.N.Y. Dec. 2, 2009), including "nonmonetary directives," FED. R. CIV. P. 11(c)(4). Thus, the question arises whether the Court should impose any non-monetary sanctions for LFLG's violations of Rule 11, mindful that any such decision must be "made with restraint and discretion," *Schlaifer Nance*, 194 F.3d at 334, and "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," FED. R. CIV. P. 11(c)(4).

The DOE requests that the Court enter an order directing LFLG "not to file any further 'emergency' motions for injunctive relief in any lawsuit without prior court permission, or in the alternative, requiring that any future motion for injunctive relief be accompanied by a sworn declaration of an attorney detailing (1) how the student's educational placement is actually at risk, and how the student will suffer irreparable harm in the absence of an injunction, and (2) the basis for portraying the motion as an 'emergency.'" Defs.' Mem. 27. Additionally, the DOE requests that the Court order that "any future contention that the school is having financial difficulties must be accompanied by a sworn declaration by Patrick Donohue that attaches financial records corroborating the assertion of financial difficulties." *Id.* It says that these are

"common sense requirements" that serve to ensure that LFLG and its attorneys "comply with the basic obligations of Rule 11(b)." *Id.* at 28.

Given that LFLG "has a history of filing vexatious, harassing [and] duplicative lawsuits," the Court agrees that monetary sanctions alone are unlikely to deter the firm. *Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (cleaned up); *see also Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986) (discussing the factors to consider in restricting a litigant's access to the court, including "whether other sanctions would be adequate to protect the courts and other parties").[16] As this Opinion has hopefully made clear, LFLG's filings in this case reflect a broader pattern and practice of weaponizing the practices and procedures of the federal courts to harass the DOE into prioritizing the claims of iBrain students above the thousands of other disabled students in New York City. That practice imposes costs on the federal courts, which must reallocate scarce judicial resources from other matters to adjudicate LFLG's entirely baseless claims on highly compressed timelines. Equally importantly, it wastes the time and resources of the DOE, which is funded by New York's taxpayers. As the Second Circuit has noted, "[t]he DOE receives thousands of funding requests under the IDEA at the start of each school year and spends hundreds of millions of dollars annually to fund placements." *Mendez*, 65 F.4th at 63. The DOE estimates that it requires "8 hours of dedicated DOE attorney time across several units," to respond to each so-called "emergency" motion. Pantalony Decl. ¶ 12. Accordingly, each of LFLG's frivolous filings represents, in a real sense, time stolen from other

---

16 On September 27, 2024, Magistrate Judge Stewart D. Aaron imposed a $24,000 sanction on Donohue for filing a "clearly frivolous" *qui tam* lawsuit against the Los Angeles Unified School District. *See United States ex rel. Donohue v. Carranza*, 751 F. Supp. 3d 295, 305-09 (S.D.N.Y. 2024). Donohue was represented in that case by Bellantoni and LFLG (then known as the Brain Injury Rights Group). The fact that that monetary sanction did not deter Bellantoni and LFLG from their conduct in this case underscores why non-monetary sanctions are warranted.

parents seeking an education for their disabled children. And that is especially concerning when the entities associated with Patrick Donohue and his family — at a minimum, iBrain and Sisters Travel — have received tens of millions of dollars in taxpayer funds. *See id.* ¶ 17.

Put simply, there is an enormous risk — if not certainty — that, absent non-monetary sanctions, LFLG will persist in its pattern of litigation misconduct, particularly in light of the fact that it has continued to make the same arguments in front of other judges in this District and sought to escape scrutiny of iBrain's finances. Nevertheless, the Court concludes that DOE's proposed sanctions are greater than necessary to deter repetition of LFLG's sanctionable conduct. Instead, the Court hereby ORDERS that (1) within thirty days of the date of this Opinion and Order, LFLG file a copy of this Opinion and Order in every pending IDEA case in which it is currently involved (except for any case pending before the undersigned), in any court in the country; and (2) for a period of three years, any motion for emergency injunctive relief filed by LFLG that pertains to pendency placements under the IDEA, whether filed in this District or elsewhere, be accompanied by a copy of this Opinion and Order and a sworn declaration of an attorney detailing (a) whether and how the student's educational placement is actually at risk and how the student will suffer irreparable harm in the absence of an injunction, and (b) the basis for portraying the motion as an emergency. The Court finds that these measures are sufficient, but no greater than necessary, "to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4); *cf. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 292-93 (2d Cir. 2021) (affirming a similar sanction with nationwide scope because of a litigant's "pattern of misconduct before many judges of the Southern District of New York and across the country.").

## CONCLUSION

For the foregoing reasons, the DOE's motion for sanctions is GRANTED in part and DENIED in part, and the Court imposes sanctions, pursuant to Rule 11 and Section 1927, on LFLG, Nicole Lancia,[17] and Rory J. Bellantoni.[18] Specifically, the Court ORDERS that:

- LFLG, Lancia, and Bellantoni shall, jointly and severally, reimburse the DOE for the attorney's fees and costs that it incurred in defending against the repeated "emergency" motions for injunctive relief and all the subsequent litigation that flowed from those motions, including the fees and costs associated with this motion;

- Within **thirty days of the date of this Opinion and Order**, LFLG shall docket a copy of this Opinion and Order in every pending IDEA case in which it is involved (except for any case pending before the undersigned), in any court in the country, and shall file proof of such filing in this case; and

- For a period of three years, any motion filed by LFLG that seeks "emergency" injunctive relief pertaining to pendency payments under the IDEA shall be accompanied by a copy of this Opinion and Order and a sworn declaration of an attorney detailing (a) whether and how the student's educational placement is actually at risk and how the student will suffer irreparable harm in the absence of an injunction, and (b) the basis for portraying the motion as an emergency.

The parties shall meet and confer in an attempt to reach agreement on the amount of attorneys' fees and costs owed to the DOE and, **no later than thirty days after the date of this Opinion and Order**, file a joint letter indicating whether the parties have reached agreement or proposing a briefing schedule to resolve any disagreement.

---

[17] Although Lancia previously withdrew from the case, *see* ECF No. 84, "[t]he Court has authority to sanction an attorney who has withdrawn from [a] case based on actions committed prior to the attorney's withdrawal." *New Falls Corp. v. Soni*, No. 18-CV-2768 (HG) (LGD), 2023 WL 183109, at *2 (E.D.N.Y. Jan. 13, 2023). In any case, as noted above, Lancia has since rejoined LFLG.

[18] The DOE also requests that sanctions be imposed on Donohue personally. *See* ECF No. 70. As central as Donohue may be to this matter, the DOE does not cite, and the Court has not found, any authority that would support the imposition of sanctions on Donohue given that he is not a party to this case, he did not appear as counsel, and there is not evidence that he prepared, let alone, filed any of the submissions at issue.

The Clerk of Court is directed to substitute Kamar H. Samuels for Defendant Melissa Aviles-Ramos, to update the caption accordingly, and to terminate ECF No. 70.

SO ORDERED.

Dated: October 2, 2026
New York, New York

JESSE M. FURMAN
United States District Judge